Good morning, your honors. John Ballas on behalf of the appellate Fausto Diaz-Lozano. I'm intending to reserve three minutes for a moment. Mr. Diaz-Lozano challenges the denial of his suppression motion and raises four sentencing issues on appeal. In his motion to suppress, he challenged the government's installation of GPS tracking devices and the extended monitoring of him over an extended period of time. You have a little bit of a cold, I think. He recognized in the briefs that this court's decision in Pineda-Pereno resolves much of his suppression claim, and I would like to, while I've argued in the briefs that the decision is erroneous, it should be re-heard and banked, I'd like to focus now on my second argument there, that the court should remand with instructions from the government to provide additional information on the number of tracking devices, when they were used, and the circumstances of how long that they were monitored during Mr. Diaz-Lozano's time. I think that enables the relevancy of that. Well, it's hard to determine that when the government hasn't informed us of what additional GPS tracking devices they've placed on. It's true that there's no direct evidence that Diaz-Lozano's trial of any, but it is very possible, and it's hard to do a fruit of the poisonous tree analysis without knowing exactly good information. I think the question, at least my question, is what could be poisonous about it in terms of the exclusionary rule given Pignera-Moreno? In other words, if there are five devices, why is it still covered by Pignera-Moreno? Well, Pignera-Moreno did not determine that if a device was placed on someone's personal, on their private property, that that was okay under the binding appellate precedent at the time. They specifically reserved that for a future date. What they decided was that binding appellate precedent. I read in your argument that regard, and my reaction was, well, that's not really a GPS problem. In other words, if somebody goes on somebody's private property, then it's a separate problem. I mean, that is, which wouldn't be covered by Pignera-Moreno, but which we have no reason to think could be. Well, we don't know that's the problem. We do know that the government's, one of their officers said that they placed GPS units more than once, but they only disclosed it one time. And so, Mr. Pignera-Moreno was believed that they were tracking him for an extended period of time, back when he was even crossing the border in February of 2010. And so, we don't know. And so, because the government never discloses information, there's never really the grounds to be able to challenge it. If they disclosed it, they would have violated an ethical duty. I mean, we can ask them to find out when they stand up whether there is such a thing, but it seems to me that if they went out to the private property and put some device on it and it had any connection at all to the ultimate conviction, even if it were to be introduced, they would have had an obligation to disclose it. And if they didn't, they've got a problem, but they didn't. Well, they may have decided that any evidence that they obtained for it, they did not use at trial. It was not part of its case. Their determination may have been it wasn't exculpatory. They were not under an obligation to do that. I don't believe they, what they said was there was no evidence introduced at trial in any way. So let me address the sentencing issues, and specifically the first three sentencing issues. The first one is that the government included in the guideline analysis five pounds of actual methamphetamine regarding a transaction on April 19, 2010, when officers only seized one-and-a-half pounds during a traffic stop. They got you the additional amount, the total five pounds, based on a single reference in a wiretap call. During an earlier wiretap call, the participants were discussing shirts and the delivery of two or two-and-a-half shirts, and there was one single reference later to a delivery. There were actually going to be five shirts delivered. Why is that not enough? It's not enough because we don't know whether or not what type of substance was delivered, whether it was cocaine or methamphetamine, and we don't know the purity of the amount. And because we don't know either one of those, it's kind of speculated to reach the five-pound level. Was that 98% purity of what was delivered? There was one-and-a-half pounds that was delivered when that exited. Which was 98% pure. Right. And the negotiations regarding that or the discussions that you're talking about were leading up to that, were they not? Yes. Okay. So at this point, it seems like it's a question of fact that the district court determined that there were five pounds based on the reference to the shirt in the phone calls, although the wiretap. So, Bill, would we not be reviewing for clear error? I think clear error is appropriate, but I think that the error is clear here where there isn't sufficient evidence to make that kind of an inference. When there's been prior discussions and transactions regarding cocaine, when we don't know the quantity or the substance that was actually delivered, it wasn't sufficient. The second sentencing issue is that the district court erred in adding a two-level enhancement for possession of a firearm. When Mr. Diaz-Lazada was never found with possessing a firearm, the probation officer, in my opinion, correctly found that the enhancement was inapplicable. So the firearm was that you killed Orange? Yes. Totally? Yes. Yes. And there was evidence that there was a stipulation that he didn't know the people who were arrested and that he didn't know Orange? Correct. Correct. I mean, but is the standard? I mean, this is what I'm following up on. It seems that we have to determine whether it was reasonably foreseeable that the defendant appellant here would anticipate that there might be a weapon in the stash house in Gilroy, isn't it? Two parts to it, whether it's reasonably foreseeable and whether it's within the scope of the jointly agreed criminal activity. The only evidence we have here is that he had a phone number with an area court for San Jose and had referred to the source of San Jose. It would be a little, I think the government would have a much stronger position if there was some evidence that he knew there was this gigantic stash house. And then maybe it's more reasonable to assume that it would be protected with firearms. But in this case, as far as the evidence shows, Mr. Diaz-Gonzalez, I would look at it and determine that they were delivering one clone. There was a certain amount of cocaine or methamphetamine from different places in the San Jose area. There's 600 pounds of drugs found as part of this drug operation. In Gilroy. It seems like the sheer scope of the drug trafficking operation here might support that it was reasonably foreseeable for Mr. Defendant to know that the Gilroy stash house would have a weapon to protect that kind of amount of drugs. I think if he knew that there was a stash house that had 610 pounds, so that he had to know, based on what he was assuming, that there were other parts to this. Certainly he had associations with other people, and he had a source of drugs that was delivering quantities of methamphetamine and cocaine. They followed someone back after they went to his house, to the Gilroy house, and they knew the house beside Booth Grove. They knew the approximate location in Gilroy. They knew him because they followed him. They followed him back to someone else. Now, the judge or the governor, I'm not sure which, just made the surmise that when he said San Jose, he meant Gilroy. Is there any reason to think that? I mean, they seem to think that San Jose was shorthand for Gilroy. Gilroy is like 30 miles away or something. Right. I mean, it's sort of maybe the general sense of the area, but yes, there's no evidence that he knew of the existence of this stash house. Was there something that changed the number? Was there any basis for an inference that he knew that there was something going on in Gilroy? No. No, in fact, it's most likely that he wouldn't have known because you would try to keep the existence of that large of a stash house to as small a number of people as possible unless someone would have a need to know. And that's why the argument, I believe, is insufficient to apply the two-level enhancement as a probation officer determined. The third sentencing issue is that the court erred in applying the three-level managerial role enhancement because it was insufficient evidence that he exercised control or supervised other individuals. The district court found the enhancement applied on the basis of one person that was involved in marijuana cultivation that says he was working for Mr. Diaz-Lizaga. But even if that is true, that would not support a three-level enhancement for organization or role, only a two-level enhancement because the marijuana conspiracy was entirely separate. He only involved three people, not five or more. But there's an EIG, I was also talking about, that it's otherwise insufficient. I'll let the audience complain. I mean, it was five and this was otherwise extensive. The guidelines do say that the district court did not make any finding it was otherwise extensive, and I don't believe it was. It was a simple marijuana cultivation. I don't know whether you want marijuana or not. I mean, it's a difference of one level, is that right? Yes. I mean, if we assume that there are two conspiracies and you can't combine them, I'm not quite sure why you can't combine the two conspiracies for this purpose. Is there any case law or anything that says you can't? I'm not aware of it, but I think that when you look at conspiracies, you actually tend to look at them separately. They're actually charged separately. This wasn't a case where they charged one overall conspiracy involving marijuana and methamphetamine. One was a growing operation. Right. And one was pretty far to the north, and the other was this trafficking company. Right. And different individuals, different locations. What kind of an act did the district judge say about this case? He applied it only on the basis of the one person in the marijuana cultivation, Bermudez, who said that he was finding the courage for Mr. Diaz-Lozada, and that that was sufficient to apply the enhancement. The other conspiracies seem pretty extensive. One was a fairly small marijuana growing operation. Yes, and the other one, I believe there's no evidence that he exercised control or managed to supervise any other individuals. It was essentially a broker-directed transaction, so he didn't manage to do the maintenance. So the district court judge may consider that. I think that since we had a full and fair hearing the first time in sentencing, the court should make the determination that only a most to two-level enhancement applies. I guess I'll turn it over to you. You're right. The ultimate is a 35-53 analysis based on the evidence. If we want to remand for whatever reason, could that district court judge consider everything else? Basically, it would do sentencing proceeding. They know both. They'd be able to consider the other conspiracy. That may be confined to just the independent conspiracy. I guess my position would be that on that one enhancement, the government presented its evidence. The court made its finding. If the evidence isn't sufficient, I think the court could determine that the evidence isn't sufficient. As presented, there's no evidence that he exercised control or supervised anyone in the larger method of valuing conspiracy. What we do is we look at what the district court did, which is the marijuana conspiracy. You see it there. What does the district network leave up with the question of the method of valuing conspiracy and remand? I guess the other alternative is? It still would be helpful to your client. It would be more helpful if the court ruled that the enhancement didn't apply. I have a question, though. Do you think, because you run the risk, when we send it back for recidivism, the judge can decide, you know what, I'll pump further reflection. I'm going to upward depart or I'm going to go higher. You run that risk. Well, I think I said it. Okay. And it's just a level. I don't know that it would be, and it's not a material difference here in light of what the sentence received. And it's a one level. So I'm just trying to figure out, is there a harmless error application here for this? So my position on that would be, first of all, there's a general presumption against increasing the sentence on remand for vindictive after an appeal unless there's new evidence or new circumstances or something, and you're convicted in prison, which I don't think is the scenario. I think that's what we were trying to find out last year. It's interesting. Essentially, there's almost no such thing as harmless error in this. There's a miscalculation. Okay. Anyway, I have time. I'll leave you with that. I'm not sure. Did you argue this in the two experiences down below? Well, I wasn't the attorney. The attorney argued that there was no evidence for the enhancement, and there was some discussion, I think, about it. Can you look maybe into, you know, if that was specifically argued? Okay. Thank you. May it please the Court. Michael Beckwith on behalf of the United States. I was probably also on this case. I'd like to go right to an issue that we were just touching on, and that is the issue of sentencing and specifically the defendant's connection to the house in Gilroy. Do you have any knowledge of Gilroy? Yes, Your Honor. We have evidence of his trial record. He told Detective Robles that he went to there, went to the house, and got ten pounds from that house. We have his name in ledgers. I thought that was in the record. That really is in the record. It is in the record, Your Honor. We also have. I think that's right. His major went there. Yes, Your Honor. He went to that. He calls, of course, the house in San Jose, which says, I went there, I picked up ten pounds from that house. We also have his name. How do we know it was the house in San Jose? Your Honor, because we have his name in ledgers that were in the house in Gilroy. His attorney was there. Your Honor, the court made a specific factual finding in light of the house in San Jose. What's the house in Gilroy? We don't know. We just. Is that the name was on a ledger? Based on the fact that his name was on a ledger, based on the fact that when he was on a wiretap call talking about obtaining drugs from the house in San Jose, those drugs came to his house and then they went back to, they followed them back to the house in Gilroy. And they found other people there. That's correct, Your Honor. And what's the standard that the government has approved by preponderance? It's a preponderance standard, Your Honor, that we believe was something they met. So it's a preponderance and then we're looking for clear error. That's correct. Your Honor, let's. The court has questions on that. One other thing that just may be of interest on this evidentiary question. Yes, Your Honor. The Air Force has a slightly friction statement, which they did find, that says that the government is not aware of any evidence that was reasonable to any other. Yes, Your Honor. We are unaware of any other evidence. Does that mean you're unaware of any other surveillance? Or you're unaware of, I mean, were you, in the case I want to know, were you purposely measuring your words to allow for the possibility that there was other surveillance, but it didn't lead to evidence in your opinion? Your Honor. Or there was other surveillance. I couldn't quite tell what you were saying. Your Honor, I tell you right now, we do not, we are unaware of any other surveillance evidence. We have, there's no evidence in the record of that and we are unaware of it. I know there's no evidence, but I'm serious. You're representing that you don't have any. Well, good job, though. Okay. What about the managerial role? Yes, Your Honor. With regard to that, I do believe if we go to remand, there is a risk of actually a full-blown announcement. If you were refined to look at the methamphetamine and marijuana conspiracies and say that, yes, clearly the methamphetamine effects did a good job really, you know, to deal with what would happen or be made, if so, if there was a basis here for the methamphetamine, I'm a little bit confused about this. You have the beauty as your son, your play doctor, as your manager, but how do you know you're going to be defended? Right? But you need a sign or something otherwise. Yes. That's okay. You can explain to me how you reached that. Yes, Your Honor. With Solorio. Solorio is another conspiracy. Yes, Your Honor. It's another conspiracy, not the marijuana conspiracy. How were you able to combine the two in this way, so to speak? Well, Your Honor, if we take the defense argument there, so it's separated, which I don't recall the argument below, but let's assume it's there. Solorio is part of that more extensive methamphetamine conspiracy, and on, I believe, the 21st at the meeting at Wal-Mart, Mr. Diaz has given methamphetamine to Solorio and then directs him to give the methamphetamine. I guess I have to be confused. Your Honor, I apologize. What confuses me is that it seems that the district court judge predicated this three-level enhancement solely in regard to the marijuana conspiracy and Bermuda's involvement in that conspiracy, and that he did not make any determination at all about whether there was any enhancement by reason of the meth conspiracy. Am I wrong about that? Your Honor, I'm not sure that the district court made such a fine cut in saying there were two conspiracies and Bermuda is one. Clearly, the record indicates that he focused on Bermuda's, because Bermuda's is the E.C. Your Honor, while I'm not clear that there are two, and there are, in fact, two conspiracies, I mean, there are. That's what they were charged, two conspiracies. Is that not the case? That's true. That's true. But is that not sufficient for personal purposes? Had nobody ever alleged that there was one conspiracy, and the only allegation was that there were two conspiracies? I suppose the theory would be that I'm charged on conspiracy of the district court judge. And just from what they actually were, they didn't seem to have that much to do with each other. I mean, one was this large trafficking operation, and the other was growing some marijuana up in the hills. And, Your Honor, under Alexander, the court, we can see that the court focused on Bermuda's. But under Alexander, this court can make a ruling or can uphold an enhancement on any basis in the record. And here you have Solario in the methamphetamine conspiracy being charged. You don't have to say that. You can make a factual finding. No, you can support, you can affirm the district court's accusation. The district court didn't even make a finding, but he was supervising Solario, didn't he? No, there's no discussion. He was supervising Solario. We don't make that finding. You can affirm based on the record, yes, Your Honor, under Alexander. That's making the finding. No, well, you're affirming that the appellate judge appropriately affirmed it. You're affirming that the district court judge was correct. Yes, he is. There's another reason. It's funny that for three years, it hasn't responded on the marijuana conspiracy. That's exactly right. The only thing with the marijuana conspiracy, when you've been willing to concede that there's not sufficient evidence to support it, three people can answer it. Yes, Your Honor. So you really need to tack on spark points. To me, there's already a little bit of spark in the record here, and you need to have five or otherwise extensive. So your argument would be that if you consider the medical conspiracy, that was otherwise extensive. Yes, Your Honor. It's the basis of that in the record. It's what you're claiming, right? That's correct. We also believe there's a basis to believe that Diaz directed Solario in the context of that conspiracy. Would the five people be relying upon the otherwise extensive product? Your Honor, it would be an otherwise extensive. It needs a manager, a low-level manager, within that extensive conspiracy. So that would get us to three, as opposed to a otherwise extensive. On the medical end, what do you think would be your three-point answer? Yes, Your Honor. I don't believe that's going to be an international drug conspiracy. I don't think that's going to be difficult to make. Well, I don't like mixing and matching quite frankly. I don't see any new case form that says that's okay to do. I'm not aware of that. Where did he get that sentence? I can't remember in the sentencing guideline range. Your Honor, this is what I wanted to get back to, that the guidelines in this case rely, if we make this decision, between a two- and three-level enhancement, we're bringing the guidelines down by one level. And in this case, the district court expressly pegged this defendant's sentence to the man in Gilroy, placing him just above it at 210 months. So there would be, what was his range? His range was life. It was life. It was life. And he came down to 17. He had a usual life expectancy. He pegged it to the man in Gilroy, Your Honor. And so those men had a high 100, 90, 170, I believe. And he gave this defendant a sentence of 210 months. So he departed from life. I mean, it's excessive, a 12-year departure. It's very unlikely that anything's going to change. If we do come back and it's possible, then we're off to a good start. I'm not sharing this with you because I'm a local district court judge. I've had a couple of situations where I've been in a district court and my colleagues may not have felt the same thing, but I always tell them, if you don't break it, you're going to be in with the courts. Also, can we go back to the guidelines for a minute, okay? Yes, Your Honor. Was it assumed that the Gilroy house was a San Jose house? I don't know. I mean, it seems a little flimsy. But still, what do we know that he knew that would have been? Do we know, on your representation, that he got three passports and anything from that house? Is that what we know? Well, we know there were actually three transactions from that house. We know there's a two-pound transaction that's kind of sort of a wiretap. We're talking about bringing two shirts from the Gilroy house to Sacramento. There's a five-pound transaction. Or he knew that it was given to the Gilroy house? Yes, Your Honor. He's calling the Gilroy house, and, in fact, we know the Gilroy house. He's calling the phone number that's in the Gilroy house or person that's in the Gilroy house? Yes, Your Honor. So he has a stipulation that he didn't know any of the people who were picked up at the Gilroy house? Well, the stipulation, to be very precise, was that he did not know the three people that were arrested there. That's absolutely correct. There was no stipulation that he didn't have any involvement with the Gilroy house, wasn't aware of the Gilroy house. In fact, as we know, his name is the ledger that's found at the Gilroy house. We'll also see the people at the Gilroy house, if they were the center of the operation, would be people ledgers found. But that doesn't mean that doesn't have anything to do with whether he knew the scope of the operation in the Gilroy house. What we believe, Your Honor, is that the student center of the operation is actually in Mexico. And when he called into the Gilroy house and asked for methamphetamine, the Gilroy house told him that no, you can't have it. And so he was called into Mexico, got the authorization, arranged for the distribution, changed, and then they brought methamphetamine to him. So he has enough knowledge of the house and enough pull within this organization to get his distribution authorization changed. So he has enough under our case law, assuming all that, for him to foresee that there's a gun. For people he doesn't know. So just because it's a big operation period in the end, there are other reasons. Well, then we think that's, we think that all of the factors that we've been talking about, the phone calls, the wiretaps, the surveillance, all of that. All he needs to do is that there was a big operation in the Gilroy house. Which was defended, right? He is a part of. Okay, but I still want to know, is that enough under our case law? For him to foresee that there was a gun there? A direct factor of this level of experience, yes, absolutely. And there's two more points, two more factual points that we haven't quite touched on. One is that the methamphetamine, in this case, was mustard. It was blue, which at the time was brand new in the market and very distinct. One, the methamphetamine was seized in Sacramento. Part of it was blue, part of it was white. When the methamphetamine was seized in Gilroy, part of it was blue, part of it was white. And both of those were at 98% purity. And so that's another connection that he has. So, I'm assuming for present purposes that he had enough connection to the Gilroy house. But the question is, is it just by itself that he was getting his drugs from an operation? Yes, Your Honor, we believe it is. We believe those facts were established by a preponderance of sentencing. We believe the court made clear factual findings. And in this court, those findings were viewed as a clear error. And in light of these facts, there was no clear error regarding the foreseeability of this comedic emotion and ledger that was found in the Gilroy stable stand there, correct? Yes, Your Honor. And in what capacity? What did it say? So, it would be something along the lines of two pounds, Fausto Diaz, two pounds, Fausto, one pound, Fausto. And so, I mean, this isn't banking-level accounting. This is narcotics accounting. From our standpoint, that's rare to see, and I think incredibly persuasive. Your Honor, last I'll point out that in the case of the suppression motion, the officers here were acting within the context of law as it existed then. And suppression of law in this case would serve no deterrent value. MacGyver was in place. Hubbard was in place. And this was a short-term monitoring case. When the vehicle was tracked, it was less than a day, better part of an afternoon, from point A to point B, exactly on all fours with Hubbard, which has been in existence for over 30 years. This is not a long-term monitoring case. We have one tracker in this case, and it was monitored for the better part of an afternoon. It was from Home Depot straight to Marijuana Grove. And we believe that in light of MacGyver, in light of Hubbard, and the other cases that exist at that time, the officers are acting clearly within the parameters of law, and suppression would be unnecessary now. Does the Court have some other questions to submit? Thank you. Thank you very much. Just to answer Judge Riviera's question, the defense attorney in his briefs argued that the enhancement did not apply, really based only on the methamphetamine conspiracy. And then when it got to sentencing, the prosecutor also pushed the alternative theory that he would be eligible for a supervisory enhancement based on the marijuana cultivation. And then the Court made the finding only on the marijuana cultivation. And the other last point of mine that I would like to bring up is on remand. If the Court does remand for resentencing, we now have this new guideline amendment that reduces all the guideline levels by two levels that I think would imply a resentencing, so that even with a one or a two-level for reduction, and then you add that two-level guideline amendment reduction, I don't think there's much of a risk that the Court would go above the sentencing imposed the first time and some decent chance you would go below the sentencing. And even your Court, so the Court is to make a decision, you will need to do that. Yes. And now it is judged. Okay. Thank you very much. Thank you. Thank you both for your arguments. The case of the United States v. Seattle is now open to submittal.
judges: Berzon, Murguia, Block